IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | Case No. 18-8-LPS |
| | ) | |
| SHANE MANTEGNA, | ) | |
| | ) | |
| Defendant. | ) | |

**GOVERNMENT'S SENTENCING MEMORANDUM**

The defendant possessed an untraceable AR 15-style semiautomatic rifle with a shortened barrel that he failed to register in the National Firearms Registration and Transfer Record; he possessed a straw-purchased, 9mm handgun after being convicted of a violent felony; and he possessed ammunition for both firearms. The defendant faces a guideline sentence range of 46 to 57 months of imprisonment. The government recommends a sentence of 46 months of imprisonment. This sentence balances the factors set forth in Section 3553(a) of the United States Code, imposing a sentence that is sufficient but not greater than necessary to reflect the seriousness of the defendant's offense, provide just punishment, protect the public, and provide the defendant with much needed treatment.[1]

---

[1] *See also* Sealed Attachment A, which the government routinely attaches to sentencing memoranda.

## I. The Defendant's Offense was Serious

On January 12, 2018, the Defendant called 911 requesting police assistance. See Presentence Investigation Report (PSR), ¶ 15. His statements to the 911 operator included:

- "I've got a mess over here at this house that somebody should take a look at";
- "To me it seems like it's the uh, a real big problem here about me and Microsoft, and in the middle of it there's, uh, an atom bomb will drop if people keep playing";
- "Do you want the world the end";
- "People need to make a change or something horrible is going to have to happen"; and
- "You need to connect the dots . . . or an atom bomb is going to drop".

See id.

As a result of his phone call, two New Castle County Police Officers responded to the defendant's residence. See id. As the officers approached the defendant's front door, one officer looked through the driver's side window of a truck parked in the driveway. See id. There, the officer saw a red object in the front seat labeled "explosive." See id. Instead of knocking on the front the door, the officers called in the explosives team in order to secure the scene. As the officer's walked away from the truck, the defendant exited his residence and stepped out onto his front porch. See id.

What followed was a three-and-one-half minute exchange that ended in the defendant's arrest. See id. at ¶¶ 15-16. During the exchange, the officers made seven or eight requests for the defendant to step off the porch, the defendant told the officers

that he rented the house and that there was someone else inside, and the defendant made the following statements:

- "I don't know what's going on but I'm not messing with it, this house is done turned around backwards";
- "I'm trying to save a nightmare from fucking happening";
- "something going on in this house . . . couch with metal wires through the fricking couch";
- "I'm not leaving my porch"; and
- "By the power invested in my by God, I'm not going to step off this porch."

See id. at ¶¶ 16-17.

After invoking God as the power that would keep him on his porch, the defendant tried to re-enter his house. See id. Both officers acted promptly to stop the defendant from doing so. See id. at ¶ 16. The defendant resisted until he was tased. See id. at ¶ 17. During this altercation, the defendant made several statements, including:

- "You don't understand, the world depends on it";
- "you don't understand, . . . please God, they're gonna hurt everyone"; and
- "you don't understand what's gonna happen, please just look at the house, please just look at the house, please just look at the house, please look at the fucking mess in the house, you don't understand the world depends on it, they're gonna fucking hurt everybody".

See id.

After placing the defendant in handcuffs, the officers walked him to a marked police vehicle and searched his pockets. See id. at ¶ 18. During the search, officers found a Smith and Wesson 9mm magazine loaded with 16 Winchester 9mm rounds. See id. The defendant continued to talk during the search, and made—among

others—the following comment: "You don't understand, there's a miracle from God in that fucking house."

An explosive-sniffing K-9 from the Explosive Ordinance Disposal Team arrived and cleared the defendant's living room. See id. Officers then performed a visual search throughout the rest of the residence for explosives. See id. at ¶ 19. When officers reached the defendant's master bedroom, they saw an AR 15-type rifle and a silver handgun laying on top of the bed in plain view. See id. Officers then secured and preserved the residence while they obtained a state search warrant authorizing a search of the residence for firearms and ammunition. With search warrant in hand, law enforcement found the following items in the defendant's residence:

- Master bedroom:
    - AR 15-type rifle with shortened barrel, .223 caliber
    - Four loaded magazines for the AR 15, with a total of 119 live rounds
    - S&W SD9 9mm handgun, SN FYN7361
    - S&W 9mm magazine with 11 live rounds
    - Bulldog 9mm handgun holster
    - One box of .223 ammo containing 20 rounds
- Basement
    - .556 magazine (usually interchangeable with .223)
    - M16/M4 magazine with 100 live rounds

See id. at ¶ 19. When officers searched Mantegna's truck, they found two "jumbo" M5000, commercial grade fireworks. See id. at ¶ 20.

Delaware State Police tested the AR 15-type rifle. See id. at ¶ 21. It is a functional, semi-automatic rifle that fires .223 caliber rounds. See id. It is of unknown make and has no serial numbers. See id. When found, the rifle had a flash suppressor attached to its shortened barrel (the suppressor can be removed). See id. With flash suppressor on, the rifle's barrel-length is 8 and 7/8 inches. See id. at ¶ 22.

Without the suppressor, the rifle's barrel-length is 7 and 5/8 inches. See id. The rifle's overall length with the flash suppressor and stock fully extended is 27.25 inches. Its length with stock fully collapsed is 23 and 7/8 inches.[2]

Law Enforcement also learned that the recovered Smith and Wesson 9mm handgun, SN FYN7361, was purchased by Sarafina Matlack from Cabela's at Christiana Mall in Newark, Delaware, in March of 2017. See id. at ¶¶ 14 and 19. Law enforcement approached Matlack, who admitted to purchasing the handgun for the defendant (her former boyfriend). See Government's Sentencing Memorandum, United States v. Sarafina Matlack, Case No. 18-56-LPS, D.I. 21. Matlack subsequently plead guilty in this Court to filing a false statement in connection with the acquisition of a firearm. Id. at D.I. 13.

## II. The Defendant is a Danger to Himself and to His Community

In the past ten years, the defendant has been convicted of two crimes that constitute violent felonies under the Guidelines[3] and three misdemeanors. See PSR, ¶¶ 37-41. In 2009, the defendant pled guilty to Assault 2nd Degree in Maryland.[4] Id.

---

[2] Thus, the rifle qualifies as a "firearm" under 26 U.S.C. §§ 5845(a)(3) and (a)(4):

> (a)    The term "firearm" means . . . (3) a rifle having a barrel or barrels of less than 16 inches in length;  (4) a weapon made from a rifle if such weapon as modified has an overall length of less than 26 inches or a barrel or barrels of less than 16 inches in length . . . .

[3] See U.S.S.G. § 2K2.1 Application Note 1, defining "felony conviction"; and see U.S.S.G. § 4B1.2(a), defining "crime of violence."

[4] Under Maryland law, Second Degree Assault is defined as "an assault." 3 Md. Code § 3-202(a). An "assault" is defined as "the crimes of assault, battery, and assault and battery, which retain their judicially determined meaning." 3 Md. Code § 3-201. The judicial meaning of "assault" is "causing offensive physical contact to

5

at ¶ 37. In 2013, the defendant pled guilty to Robbery in Pennsylvania.[5] Id. at ¶ 41. In 2011 and in 2012, the defendant pled guilty to misdemeanor theft in Maryland and in Delaware, respectively. Id. at ¶¶ 38 and 40, respectively. And in 2011, the defendant pled guilty to possessing marijuana in Maryland. Id. at ¶ 39.

We know little about the defendant's 2009 conviction, only that the defendant was 20 years old that the time and that he received a very light sentence (even after a violation of probation in March of 2011). See id. at ¶ 37. We know more about the defendant's 2013 Robbery conviction. Here, the defendant was caught stealing laundry detergent from an ACME Supermarket in Pennsylvania (the defendant had pled guilty a year earlier to taking part in an organized retail crime ring where he stole detergent from several stores in New Castle, Delaware). See id. at ¶ 41. An ACME employee attempted to intervene as the defendant placed the stolen detergent in his trunk. See id. The defendant pushed the employee away as he slammed his trunk closed. See id. The trunk hit the employee's elbow in the process. See id. For this conduct, the defendant received a sentence of six to twelve months in prison followed by five years of supervised release. See id. The defendant was in his fifth year of probation when he was arrested for the instant offense. See id.

---

another person." *Quansah v. State*, 53 A.3d 492, 500 (Md. Ct. Spec. App. 2012). The maximum penalty for Second Degree Assault is 10 years in prison. The defendant pled guilty to a violation of 3 Md. Code § 3-203, which defines "physical injury" as "any impairment of physical condition, excluding minor injuries."

[5] Under Pennsylvania law, Robbery includes "inflict[ing] bodily injury upon another or threaten[ing] another with or intentionally put[ting] him in fear of immediate bodily injury." This is the charge to which the defendant pled guilty.

There is no question that the defendant's mental health played a role in his criminal conduct, but we do not know to what extent. The defendant left MeadowWood in early December of 2017—about a month before his arrest. See id. at ¶ 56. He was admitted because he had been going from car dealership to car dealership demanding a free car. See id. He was also accusing his parents of stealing money from him and conspiring to put him in jail. See id. At MeadowWood, the defendant was diagnosed with bipolar disorder. See id. The defendant entered MeadowWood again on January 12, 2018—the day of his arrest. See id. at ¶ 58. There, the defendant was diagnosed with Chronic Paranoid Schizophrenia. See id. at ¶ 59. This time, his doctor noted that the defendant's "risk for suicide and homicide is moderate to high" and that his "risk of violence to others is very high." See id.

Such statements are alarming, especially considering that—just days prior—the defendant had immediate access to a lethal arsenal. Moreover, two months before that, the defendant posted a video on YouTube where he watched and threatened fictitious prowlers on an array of security camera feeds (attached as Exhibit 1). Watching such a video, there can be no question that the defendant was suffering from severe mental illness.

But the defendant's mental illness was not so debilitating that it stopped him from acquiring two firearms. The defendant still had the wherewithal to use his girlfriend to straw purchase a 9mm handgun, thereby avoiding federal detection. Moreover, the defendant was able to acquire an untraceable semi-automatic assault-style rifle with a shortened barrel. Last, the defendant was able to acquire the

7

ammunition needed to use both. Such deliberate actions—in temporal proximity to a high risk of violence to others—show the serious danger that the defendant posed both to himself and to his community.

### III. A Guideline Sentence is Necessary to Protect the Community and Provide Adequate Treatment

The defendant pled guilty to possessing an AR 15-style rifle with a shortened barrel that the defendant failed to register with the proper authorities. See D.I. 27. This was in violation of Title 26, United States Code, Section 5861(d). See id. Because of prior violent felony convictions, the defendant faces a base offense level of 22. PSR, ¶ 27. After three levels have been subtracted for acceptance of responsibility, the defendant's final offense level is 19. Id. at ¶ 35. With a Category IV Criminal History, the defendant's guideline sentencing range is 46 to 57 months of imprisonment. Id. at ¶¶ 43 and 74.

///

The defendant's offense was serious. He obtained an untraceable semi-automatic rifle and used his girlfriend to straw-purchase a handgun. He also has a history of theft and a willingness to resort to violence. His recent mental health history further solidifies the danger he poses to himself and to others. That danger, combined with the firepower necessary to injure or kill many people, must be addressed in order to protect the public. Significant time away from society is necessary to balance the factors set for in Title 18, United States Code, Section 3553. For these reasons, the government recommends a guideline sentence of 46 months of imprisonment.

        Respectfully submitted,

        DAVID C. WEISS
        United States Attorney

By:   */s/ Graham L. Robinson*
       Graham L. Robinson
       Assistant United States Attorney

Dated: June 21, 2019